UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LISA NILES**,<br><br>            Plaintiff,<br><br>    v.<br><br>**U.S. CAPITOL POLICE**,<br><br>            Defendant. | Civil Action No. 16-1209 (TSC) |

## MEMORANDUM OPINION

Plaintiff Lisa Niles, a former police officer with the U.S. Capitol Police ("USCP"), has sued the USCP, claiming that her termination constituted disability discrimination under the Americans with Disabilities Act ("ADA") and race and sex discrimination under Title VII of the Civil Rights Act of 1964. USCP has moved for summary judgment. ECF No. 52. For the reasons stated below, the court will GRANT Defendant's Motion.

### I.    BACKGROUND

In reciting the relevant facts, the court relies mainly on the undisputed material facts set forth by Defendant, along with Plaintiff's responses thereto. Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts, ECF No. 55-1 ("Pl.'s Resp. to SUMF"). At the outset, a word about the meaning of "undisputed" facts is in order. The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To dispute a fact, "the non-movant must rely on evidence—i.e., its opposition must

consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Rochon v. Lynch*, 139 F. Supp. 3d 394 (D.D.C. 2015) (quotation omitted), *aff'd,* 664 F. App'x 8 (D.C. Cir. 2016).  Where Defendant has stated certain facts and supported them with evidence, therefore, the court treats those facts as undisputed if Plaintiff's only response is to deny them without counter evidence or to raise generic protests against them that are unrelated to the facts' veracity.

Accordingly, the following facts are undisputed:  On May 30, 2014, Amtrak contacted Defendant to report two incidents in which Plaintiff—who is a Black woman—"boarded an Amtrak train as a passenger and did not pay her fare."  Pl.'s Resp. to SUMF ¶¶ 68–69.  According to the Amtrak Police Department (APD), the first incident occurred on February 26, 2014 and Plaintiff "not only did not pay for a ticket," but also "sought to avoid getting discovered by a conductor by moving to another car or going to the bathroom while the conductor collected tickets."  *Id.* ¶ 70.  The conductor also said that "he observed Plaintiff remove a seat check from another passenger's seat" and then claim that another conductor had given it to her, which the other conductor denied.  *Id.* ¶ 86.  An APD officer's report states that when he confronted Plaintiff about her lack of ticket or payment, she "explained that she did not realize she could not take Amtrak Trains."  *Id.* ¶ 77.  The officer explained to her Amtrak's policy that non-Amtrak law enforcement officers "are required to have a ticket to ride."  *Id.* ¶¶ 77–78.

The second incident occurred on May 17, 2014.  An Amtrak conductor said she encountered Plaintiff on the station platform at Wilmington, Delaware, asked if Plaintiff had a ticket, and Plaintiff answered that she did.  *Id.* ¶ 82.  But when the conductor asked Plaintiff to

show the ticket after she boarded the train, "Plaintiff appeared to search for a ticket but then stated 'Well, I don't actually have a ticket-ticket.'" *Id.* The conductor, who later told Defendant that "other conductors had previously had issues with Plaintiff riding Amtrak without paying," *id.* ¶ 84, once again summoned APD officers, *id.* ¶ 94. An officer stated that she escorted Plaintiff to the APD office and explained "that this was not the first time she had stopped Plaintiff," and that Plaintiff "had committed a crime." *Id.* ¶ 96.

Defendant appointed an Investigator in its Office of Professional Responsibility ("OPR") to review Amtrak's complaint against Plaintiff. *Id.* ¶ 76. The Investigator spoke with the Amtrak conductors and APD officers involved in the two incidents. *Id.* ¶¶ 77–78, 80, 85, 93. The Investigator also interviewed Plaintiff twice, and in both interviews she acknowledged her obligation to answer all questions truthfully. *Id.* ¶ 100. During the interviews, Plaintiff denied that she was stopped by APD on February 26, 2014, or that she had been informed of Amtrak's policy requiring non-Amtrak law enforcement officers to purchase tickets. *Id.* ¶¶ 102, 112–13. Plaintiff did recall being stopped by APD on May 17, 2014 but denied that she had told a conductor that she had a ticket before boarding. *Id.* ¶ 102, 106. Plaintiff claimed that she had asked a male conductor whether it was "okay for [her] to ride, and he nodded his head . . . as to mean yes." *Id.* ¶ 111. Later, Plaintiff said, she "was told to get off the train by a female conductor and did not resist" paying for the ticket "because APD asked her to pay." *Id.* ¶¶ 109–110. But she admitted that "she continued to ride the train without paying even after being stopped on May 17, 2014 and told by APD that from then on she needed to purchase a ticket before she boarded any Amtrak train." Def.'s Mot. for Summary Judgment, Ex. 4 at 8, ECF No. 52-6.

Based on his review, the Investigator "sustained"—that is, "found sufficient evidence that a violation of [Defendant's] Rules of Conduct occurred," Pl.'s Resp. to SUMF ¶ 37—charges against Plaintiff for "Conduct Unbecoming" and "Truthfulness," *id.* ¶ 116.  The Investigator's report was approved by OPR officials and submitted to Disciplinary Review Officer ("DRO") Scharon Ball for assignment of a recommended penalty based on "the nature and seriousness of the offense, the employment history of the employee, any mitigating factors, and penalties issued in similar cases."  *Id.* ¶¶ 122, 46.

Ball recommended a penalty of demotion for the Conduct Unbecoming charge, and termination for the Truthfulness charge.  *Id.* ¶ 123.  Specifically, she found that "Plaintiff's conduct was extremely serious" because it "was technically a crime," because Plaintiff had repeated the conduct even after having been stopped by APD Officers on February 26, because Plaintiff apparently attempted to mislead Amtrak conductors during both incidents, and because Plaintiff (as a Sergeant) was a "supervisory law enforcement officer."  *Id.* ¶ 125.  Ball found "that Plaintiff's version of events was not credible" given the "multiple witness statements and police reports" contradicting it.  *Id.* ¶ 126.  Ball considered Plaintiff's otherwise good employment history, but concluded that it did not warrant a penalty reduction.  *Id.* ¶ 127.  Ball also noted as a potential mitigating factor that some Amtrak conductors apparently allowed Plaintiff to ride the train without paying, which "could have confused Plaintiff into believing that an Amtrak policy entitled law enforcement to courtesy rides."  *Id.* ¶ 128.  However, Ball reasoned that any confusion "should have [been] cleared up on February 26, when the policy was explained to her," and that in any event the confusion "could not explain her attempts to deceive the Amtrak conducts" during both incidents.  *Id.*  Ball did not find any similar recent cases

involving "supervisors making untruthful statements during OPR investigations or being stopped multiple time[s] by an external police agency for unlawful conduct." *Id.* ¶ 129.

After Plaintiff was presented with the charges, she appealed them to USCP's Disciplinary Review Board Panel. *Id.* ¶¶ 131, 134. During the appeal proceedings, Plaintiff admitted that APD Officers had in fact told her that riding without a ticket was unlawful. *Id.* ¶ 137. She also presented evidence from a neurologist, Dr. Reed. *Id.* ¶ 134. Based on "Plaintiff's past medical records, an old MRI, and Plaintiff's representations to him that she did not remember the February 26, 2014 incident," Dr. Reed characterized that lack of recollection as a "[l]ong amnesic episode . . . that could have represented transient global amnesia" and may have been related to Plaintiff being "under a lot of stress, depression, anxiety, and poor sleep" at the time. *Id.* ¶ 160. Ultimately, the Panel upheld both the charges against Plaintiff and the penalties recommended by DRO Ball. *Id.* ¶ 138–39. In addition to the grounds set forth in Ball's recommendation, the Panel also noted that Plaintiff's admission that APD Officers had warned her that ticketless riding was a crime meant that she had not been truthful in telling the Investigator that she had never received any such warning. *Id.* ¶ 141.

Plaintiff then appealed her penalty recommendation to USCP Chief of Police Kim C. Dine. *Id.* ¶¶ 8, 142. She did not contest the charges themselves but argued that the recommendation and the Panel "failed to properly consider evidence of [her] mental condition" and otherwise did not properly account for all four relevant factors. *Id.* ¶¶ 143–44. Chief Dine denied the appeal for reasons similar to those in the penalty recommendation and Panel decision. *Id.* ¶¶ 146–51. In particular, he noted Plaintiff's untruthfulness to the Investigator about APD warning her, and stated that he "did not believe that Plaintiff was truthful when she told OPR that she had no recollection" of the February 14, 2014 incident. *Id.* ¶ 148. Chief Dine likewise did

not credit Plaintiff's claim that she suffered from amnesia, noting that all the doctors who had examined Plaintiff found that "her neural examination was 'from head to toe normal' and her supervisors did not observe any memory difficulties," including on February 14. *Id.* He also declined to consider Plaintiff's statement in her appeal that she "had not taken the train without paying since May 17, 2014" as a mitigating factor because it "was contradicted by Plaintiff's Statements to [the] Investigator." *Id.* ¶ 149. Chief Dine therefore recommended to the Capitol Police Board that Plaintiff be terminated, and the Board agreed and approved the termination effective August 24, 2015. *Id.* ¶¶ 154–56.

After her termination, Plaintiff submitted requests for Counseling and Mediation with the Office of Compliance pursuant to Section 402 of the Congressional Accountability Act, alleging that she was terminated based on race, sex, national origin, color, disability, and age, and denied FMLA leave. *Id.* ¶ 157. That mediation ended on March 28, 2016, and Plaintiff brought this suit on June 20, 2016. *Id.* ¶¶ 157–58; *see* Compl., ECF No. 1. In 2019, the court granted in part and denied in part Defendant's Motion to Dismiss Plaintiff's Amended Complaint. *See* Order, ECF No. 27; Amended Order, ECF No. 30; *Niles v. U.S. Capitol Police*, 2019 WL 1858503 (D.D.C. Apr. 25, 2019).

## II.   LEGAL STANDARD

Summary judgment is appropriate where there is no disputed genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322–23. "A genuine issue of material fact exists if the evidence, 'viewed in a light most favorable to the nonmoving party,' could support a reasonable jury's verdict for the non-moving party." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (citing *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012)). Federal Rule of Civil Procedure 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Thus, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

### III.   ANALYSIS

#### A.  Disability discrimination

The Congressional Accountability Act extends certain ADA protections to legislative branch employees, including USCP officers. *See* 2 U.S.C. § 1311(a). The court evaluates ADA claims under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To make a prima facie case of discrimination under the ADA, a plaintiff must show that (1) she was disabled within the meaning of the ADA, (2) she was qualified for the position at issue with or without a reasonable accommodation, and (3) she suffered an adverse employment action because of her disability. *Giles v. Transit Emp. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015). A person is disabled under the ADA if she has a physical or mental impairment that substantially limits one or more of her major life activities, has a record of such an impairment, or has been regarded as having such an impairment. *See* 42 U.S.C. § 12102(1)(A)–(C).

Plaintiff's prima facie case of disability discrimination fails at the first step: She has failed to present sufficient evidence that she was disabled within the meaning of the ADA. Plaintiff cites only to the three doctors' reports she solicited in 2014 through 2016. *See* Pl.'s Opp. to Def.'s MSJ at 9, ECF No. 55. But none of the reports show that Plaintiff has or had an impairment that substantially limits one or more of her major life activities, much less that she has been regarded as having that impairment or has a record of it. Dr. Reed's report only speculated that Plaintiff's inability to recall the events of February 26, 2014 "could have

represented transient global amnesia" without reaching that conclusion, specifically noting that further episodes would necessitate "differential diagnoses," ECF No. 58-19 at PDF p. 6—that is, gathering additional information to ascertain the medical cause of the memory loss, *see* Diagnosis and differential diagnosis, 3 Mod. Sci. Evidence § 21:40 (2022-2023 Edition). Likewise, Dr. Geary only noted that any potential "differential diagnosis would include transient global amnesia; short-term memory loss related to severe stress, depress, anxiety; [and] nonconvulsive status epileptics"—without determining whether Plaintiff actually suffered from any of those conditions. ECF No. 58-20 at PDF p. 4. And Dr. Porter similarly went only as far as stating that Plaintiff "may have suffered from episodic problems with her recall" that "are notable in patients with cognitive impairments such as dementia, but are also seen in normal individuals," especially those experiencing "stress, depression, and sleep deprivation." ECF No. 58-23 at PDF p. 3.

      Moreover, all three doctors' reports confirm that Plaintiff had only one claimed instance of memory loss, and that she was otherwise in good physical and neurological health. *See* ECF No. 58-19 at PDF p. 6; ECF No. 58-20 at PDF p. 5–6; ECF No. 58-23 at PDF p. 2–3; *see also* Pl.'s Resp. to SUMF ¶ 148 (Chief Dine "noting that Plaintiff's doctors said that her neural examination was 'from head to toe normal' and her supervisors did not observe any memory difficulties"). At the motion to dismiss stage, the court liberally construed Plaintiff's Amended Complaint as alleging "more than one occasion" of memory loss, which could constitute an impairment to major life activities like "reading, concentrating, thinking, and communication." *See Niles*, 2019 WL 1858503 at *4. "The burden at the summary judgment stage and at trial is different and substantially more onerous than the pleading burden." *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017). Because Plaintiff has failed to meaningfully

substantiate any such impairment, she has failed to meet her burden of establishing at least a material dispute of fact as to whether she was disabled. Without that essential element, her claim of disability discrimination cannot succeed, and the court will grant summary judgment to Defendant. Accordingly, the court need not reach Defendant's additional arguments regarding whether Plaintiff's termination was "because of" her disability. *See* Def.'s MSJ Memo at 26–31, ECF No. 52-1.

B.  **Age and race discrimination**

The Congressional Accountability Act also extends Title VII's protections to legislative branch employees like Plaintiff, and here, too, the *McDonnell Douglas* burden-shifting framework applies. 2 U.S.C. § 1311(a)(1); *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981) (applying the *McDonnell Douglas* framework in Title VII case). But in this case, Defendant does not contest that Plaintiff has made out prima facie cases for race and sex discrimination, instead arguing that "it has presented a valid business reason for its decision to terminate" Plaintiff—her Rules of Conduct violations—and that she has not demonstrated that that reason was a pretext for discrimination. Def.'s MSJ Memo at 31–32; *Niles*, 2019 WL 1858503 at *6. A plaintiff may show that an employer's stated reason for the employment action is a pretext for discrimination by either: (1) producing evidence suggesting that the employer treated other employees of a different race or sex "more favorably in the same factual circumstances"; or (2) producing evidence suggesting that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).

Plaintiff attempts to make the first kind of showing by identifying other USCP employees of a different race or sex who, she argues, were treated more favorably despite being similarly situated. To be similarly situated, the plaintiff and the potential comparator must be "charged

with offenses of comparable seriousness," and "all of the relevant aspects of [their] employment situation [must be] nearly identical." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (quotations omitted). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.* As the court has already noted, the plaintiff "bears the burden of coming forward with affirmative comparator evidence." *Niles*, 2019 WL 1858503 at *7.

Plaintiff contends that she has identified twelve comparators, to whom the parties refer anonymously by abbreviated titles and numbers:

(1) PFC29: a white male Private First Class charged with Conduct Unbecoming and given a 14-day suspension after being evasive with another police department during a traffic stop, Def.'s Resp. to Pl.'s Statement of Material Facts in Dispute ¶¶ 2–7;

(2) PFC17: a white female Private First Class charged with Conduct Unbecoming and given a 3-day suspension after yelling at another driver and breaking their door handle after a traffic accident, *id.* ¶¶ 8–14;

(3) PFC22: a white male Private First Class charged with Conduct Unbecoming and given a 14-day suspension after being investigated for taking items from a convenience store despite his credit card being declined, and resisting direction from the store employees and another police department for him to properly pay for the items, *id.* ¶ 15–25;

(4) DC01: a white male management official charged with Conduct Unbecoming and demoted after failing to disclose a romantic relationship with a subordinate officer, *id.* ¶¶ 26–33;

(5) PFC13: a Black male Private First Class charged with Conduct Unbecoming and given a warning after a dangerous traffic violation, *id.* ¶¶ 34–40;

(6) PFC15: a Black male Private First Class charged with Conduct Unbecoming and given a 1-day suspension after deliberately shouldering into another officer in the hallway, *id.* ¶¶ 41–47;

(7) PFC26: a white male Private First Class charged with Conduct Unbecoming and given 10-day and 7-day suspensions, plus removal from a certain detail, for threatening, demeaning, and aggressive behavior with his team and multiple unauthorized vehicle stops, *id.* ¶¶ 48–53;

(8) SGT03: a white female Sergeant charged with Truthfulness in 2003 after lying about attending a meeting, whose recommended penalty of termination was reduced pursuant to a settlement, and who was charged with Conduct Unbecoming and demoted in 2015 after providing a photo of a firearm left in a bathroom in the Capitol Visitor's Center to the media, *id.* ¶¶ 54–63;

(9) LT01: a Black male Lieutenant charged with Conduct Unbecoming and given a 7-day suspension after getting into a confrontation with another officer, *id.* ¶¶ 64–70;

(10) CPT01: a white female Captain charged with Conduct Unbecoming and given a 7-day suspension after keeping unauthorized copies of documents from a prior OPR investigation, *id.* ¶¶ 71–78;

  (11) LT03: a white female Lieutenant charged with Conduct Unbecoming and given a 3-day suspension after disclosing details of an OPR investigation through unauthorized channels, *id.* ¶¶ 79–86;

  (12) PFC27: a white male Private First Class charged with Conduct Unbecoming and given 30 days of suspension over 6 months after failing to disclose a previously unreported DUI, *id.* ¶¶ 87–92.

Plaintiff argues that these "comparators that show a pattern and practice of the Department to give lenient punishments for similar activity to employees outside of Plaintiff's protected classes." Pl.'s Opp. to Def.'s MSJ at 10.

  In denying Defendant's motion to dismiss, the court noted that Plaintiff may have "difficulties . . . [in] locating appropriate comparators," and that prediction has proved prescient. *See Niles*, 2019 WL 1858503 at *7. While the twelve disciplined USCP employees Plaintiff proffers as comparators share some commonalities with her, each is meaningfully distinct in one or more of "the relevant aspects of [their] employment situation"—including their "jobs and job duties, whether they were disciplined by the same supervisor, and . . . the similarity of their offenses." *Burley*, 801 F.3d at 301. Consequently, none of the twelve other employees were similarly situated enough to be an appropriate comparator for the discipline Plaintiff received here. *Id.*

  Courts in this district have routinely recognized that "employees and supervisors necessarily possess different job functions and responsibilities" and are therefore not similarly situated. *Clarke v. Washington Metro. Area Transit Auth.*, 904 F. Supp. 2d 11, 17 (D.D.C. 2012), *aff'd*, 540 F. App'x 3 (D.C. Cir. 2013); *White v. Tapella*, 876 F. Supp. 2d 58, 71 (D.D.C. 2012). In addition, Defendant reports that "generally speaking, supervisors are held to [a] higher

standard" than other USCP employees.  Pl.'s Resp. to Def.'s SUMF ¶ 47.  That makes all of the non-supervisor, Private First Class comparators—seven of the twelve employees identified—differently situated from Plaintiff by virtue of her supervisory position as a Sergeant.

Plaintiff has also failed to show that any of the twelve comparators were disciplined by the same supervisor as her.  She points to "no record evidence whatsoever" that they share "the same chain of command."  *Anyaso v. United States Capitol Police*, 39 F. Supp. 3d 34, 43 (D.D.C. 2014).  At most, Plaintiff notes that the DRO assigned to recommend the charge and penalty against her, Scharon Ball, was also assigned to five of her proposed comparators: PFC22, PFC15, SGT03, CPT01, and LT03.  *See* Pl.'s Opp. to Def.'s MSJ at 12–14.  But DROs do not supervise USCP officers, or even have the power to impose disciplinary penalties; their role is limited to making a recommendation which must then be approved by the Deputy General Counsel and Bureau Commander.  *See* Pl.'s Resp. to Def.'s SUMF ¶¶ 43, 46, 51–53.  As a result, the common DRO does not demonstrate that the "individuals involved in [the] disciplinary process with the power to grant or deny a [penalty]" were the same.  *Burley*, 801 F.3d at 295, 302; *see Ladson v. George Washington Univ.*, 204 F. Supp. 3d 56, 67 (D.D.C. 2016) (concluding that a fellow police officer was not "a comparator to Plaintiff because he was not supervised by [the same] Chief").  In other words, Plaintiff has not identified a common supervisor with any of her proposed comparators.

Beyond the different institutional positions held by Plaintiff and her proposed comparators, the conduct underlying their respective penalties is also different.  The offenses need not match exactly, of course, so long as they are of comparable seriousness.  *Burley*, 801 F.3d at 301.  But even framing Plaintiff's charges in general terms—(1) repeated failure to pay for services (2) despite having been warned about its illegality, plus (3) untruthfulness with the

personnel investigating those incidents—none of the proposed comparators' conduct is a sufficient match. Many of the other officers' offenses, like PFC13's traffic violation or PFC15's bumping into another officer in the hallway, were not "of even arguably comparable seriousness." *Id.* at 302. Only one of the other officers, SGT03, also faced a Truthfulness charge, and that was for an incident more than a decade removed from her Conduct Unbecoming charge. Def.'s Resp. to Pl.'s Statement of Material Facts in Dispute ¶¶ 54–63. And only one other officer, PFC22, had conduct involving taking something without paying for it, but that was a single instance and he was not also charged with a Truthfulness violation. *Id.* ¶¶ 15–25.[1] In sum, although some of the twelve other officers were charged with some offenses comparable to some of Plaintiff's charges, none were charged with all. Accordingly, none is an appropriate comparator, and Plaintiff has not met her burden to supply evidence calling into question whether Defendant's otherwise valid reasons for terminating her were pretexts for discrimination.

---

[1] Plaintiff asserts that several of the other twelve officers could have been charged with untruthfulness but were not—presumably because of their favored race or sex. Pl.'s Opp. to Def.'s MSJ at 12–14. But OPR's investigators only sustain charges against officers when they find that "a preponderance of the evidence shows that a violation occurred." Pl.'s Resp. to Def.'s SUMF ¶¶ 34–37. Plaintiff does not identify such a finding for any of the other officers. *See* Def.'s Reply at 6 n.5, 9–10, 12, 14–15.

## IV. CONCLUSION

Plaintiff has not sufficiently shown that there is a genuine disputed issue of material fact with respect to essential elements of both her ADA and Title VII claims. Consequently, the court will GRANT Defendant's Motion for Summary Judgment, ECF No. 52. An Order will accompany this Memorandum Opinion.

Date: June 8, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge